## AFFIDAVIT OF MARK LEDDY, PHD, CCC-SLP

STATE OF _____         §
                                  §
COUNTY OF _____           §

Before me, the undersigned notary, on this day personally appeared Mark Leddy, PhD, CCC-SLP, a person whose identify is known to me.  After I administered an oath to him, upon his oath he said:

    1.      My name is Mark Leddy, PhD, CCC-SLP.  I am over the age of 18 and otherwise competent to make this affidavit.  I have personal knowledge of the facts stated in this affidavit and they are true and correct.

    2.      All the statements in the attached letter are accurate.


_____
                     Affiant


SWORN TO and SUBSCRIBED BEFORE ME on this _____ day of _____, 2007.


_____
Notary Public in and for the State of _____

My Commission Expires: _____

**EXHIBIT**

tabbies*

**8**



THE UNIVERSITY
of
WISCONSIN
MADISON

February 16, 2005

ADA Materials
Manager of Test Administration
211 East Chicago Avenue, Suite 1846
Chicago, IL 60611-2678

RE: Kirk D. Jenkins

To Whom It May Concern:

I am writing at the request of Kirk D. Jenkins, a former student of the University of
Wisconsin-Madison. While a student at our campus Kirk had a documented disability
and was a client of the McBurney Disability Resource Center. I was his support service
counselor. Based on documentation and history of disability, the following academic
accommodations were recommended for Mr. Jenkins, specifically, extended time on tests
with examinations up to time and a half, access to note-takers as needed, and access to a
dictionary when taking a test. These accommodations were in place since September
2000. It would be appropriate to provide the same accommodations for the DAT
examination.

If you have any questions, please contact me at 608-265-5467 or mhleddy@wisc.edu

Sincerely,

Mark Leddy, PhD, CCC-SLP
Accommodations Specialist: Learning Disorders

CC: K. Jenkins

O:\McBurney\Students\Student Specific\F-J\JENKINS, Kirt ltr Feb 16 05.doc

## AFFIDAVIT OF LINDA GUNKEL

**STATE OF** _____ §
§
**COUNTY OF** _____ §

Before me, the undersigned notary, on this day personally appeared Linda Gunkel, a person whose identify is known to me. After I administered an oath to her, upon her oath she said:

1.     My name is Linda Gunkel. I am over the age of 18 and otherwise competent to make this affidavit. I have personal knowledge of the facts stated in this affidavit and they are true and correct.

2.     I am an Accommodations Specialist in the McBurney Disability Resource Center at the University of Wisconsin, Madison. Kirk D. Jenkins, while a student at the University of Wisconsin, had a documented disability and was a client of the McBurney Disability Resource Center. I was his support service counselor. Based on documentation and history of disability, the following academic accommodations were recommended for Mr. Jenkins, specifically, extended time on tests and examinations up to time and a half. These accommodations were in place starting in September of 2000 and continued throughout Kirk's tenure and the University of Wisconsin. It would be appropriate to provide the same accommodations for the USMLE Step 1 exam.

_____
                                        Affiant

SWORN   TO   and   SUBSCRIBED   BEFORE   ME   on   this   _____   day   of
_____, 2007.

_____
Notary Public in and for the State of
_____



**THE UNIVERSITY** *of*
**WISCONSIN**
M A D I S O N

February 5, 2004


MCAT Program Office
Tyler Building
2255 North Dubuque Road
Iowa City, IA  52243

RE:  Kirk D. Jenkins

To Whom It May Concern:

I am writing at the request of Kirk D. Jenkins.  This student has a documented disability
and is a client of the McBurney Disability Resource Center.  I am his support service
counselor.  Based on documentation and history of disability, the following academic
accommodations have been recommended for Mr. Jenkins, specifically, extended time on
tests and examinations up to time and a half.  These accommodations have been in place
since September 2000.  It would be appropriate to provide the same accommodations for
the MCAT examination.

If you have any questions, please contact me.

Sincerely,



Linda Gunkel
Accommodations Specialist

Cc: K. Jenkins

**McBurney Disability Resource Center**
905 University Avenue    Madison, Wisconsin 53715–1005    608/263–2741    Fax: 608/265–2998
TTY  608/263–6393    Email:  mcburney@uwmadmail.sevices.wisc.edu    http://www.mcburney.wisc.edu

**ASSOCIATION OF AMERICAN MEDICAL COLLEGES**

March 5, 2004

Kirk Jenkins
6605 Peninsula Lane
Ringle, WI 54471

*Sent by email to kdjenkins@students.wisc.edu*
*And by first class mail*

Dear Mr. Jenkins:

Your request for accommodation for the April 17, 2004 administration of the Medical College Admission Test (MCAT) was received February 12, 2004, and your documentation has now been carefully reviewed. You requested time and one-half, a spell checker, and a separate room, on the basis of a learning disability. Your file consists of your request, evaluations from Dr. Holmes, Michael Gontarz, and Dr. Holmes, a letter from the University of Wisconsin, and ACT score reports.

We are prepared to provide time and one-half with seating in a separate room (i.e. there may be one or more individuals with similar accommodations present). We can not approve spell checker or a spelling dictionary, as they are not allowable for the MCAT. Spelling does not enter the rubric for scoring on the writing sample and therefore should not influence your score.

Please be assured that the Association of American Medical Colleges and ACT are committed to providing reasonable accommodations to individuals with disabilities. We must also be mindful to protect the integrity of the entire assessment process. Multiple viewpoints need to be considered and balanced. We carefully consider the issues of fairness for each applicant requesting accommodations, as well as for all other participants in the assessment.

A request for reconsideration/appeal must be received by March 19, 2004 and must be presented in writing. Such a request should contain new and additional information not previously considered. Should you have additional information that was not included in the initial review you may fax this information to my attention at 319/337-1122. If you have other questions, I can be reached at 319/337-1469. If we receive nothing further by March 19, 2004, you will be registered with the accommodation noted above.

Sincerely,

Harlan J. Stientjes, Ph.D.
Licensed Psychologist
Consultant, Accommodated Testing

I Gabrielle Campbell hereby certify
that this is a true and correct copy of the original document
*Gabrielle Campbell* Signatory
District of Columbia : SS
Subscribed and Sworn to before me
this _9th_ day of _November_, 2007
*[signature]* Notary Public, D.C.
My commission expires _January 31, 2011_

**EXHIBIT**

tabbies

9

MCAT Program Office
2255 North Dubuque Road, P.O. Box 4056
Iowa City, Iowa 52243-4056
(319) 337-1357
www.aamc.org/mcat

**MCAT** AAMC
MEDICAL COLLEGE ADMISSION TEST

**AFFIDAVIT OF ~~EDWARD C. HALPERIN, M.D., M.A., F.A.C.R.~~** DAVID L. WIEGMAN, PhD

**STATE OF** Kentucky §

**COUNTY OF** Jefferson §
§
DAVID L WIEGMAN, PH.D.

Before me, the undersigned notary, on this day personally appeared ~~Edward C. Halperin,~~ ~~M.D., M.A., F.A.C.R.~~, a person whose identify is known to me. After I administered an oath to him, upon his oath he said:

DAVID L. WIEGMAN, PH.D.

1.     My name is ~~Edward C. Halperin, M.D., M.A., F.A.C.R.~~ I am over the age of 18 and otherwise competent to make this affidavit. I have personal knowledge of the facts stated in this affidavit and they are true and correct.

2.     I am the ∧Vice Dean of the School of Medicine at the University of Louisville. Kirk D. Jenkins, is one of our medical students. I would like to provide some background information on Mr. Jenkins and his experiences in the first two years of medical school at the University of Louisville.

3.     When Mr. Jenkins applied for admission to the class entering in 2005, he was very forthright in providing documentation of his dyslexia and his life-long experience with it. He was first diagnosed as dyslexic in third grade, based on extensive testing. He has since undergone a wide range of testing several times and the results are all quite consistent. As a result of this definitive diagnosis, he has always been supplied with accommodations (normally time and a half and a quiet environment to take the examinations). He received these accommodations in grade school, high school, college and for the MCAT. His academic performance was good and we admitted him two years ago.

4.     With Mr. Jenkins long-term and thorough documentation of dyslexia, we have provided him with testing accommodations throughout his first two years of medical school. He

EXHIBIT
10

has passed all courses on the first attempt and is now ready to take USMLE Step 1 and then

progress into the third year of medical school.

_____
Affiant

SWORN   TO   and   SUBSCRIBED   BEFORE   ME   on   this  _26_  day  of

_____ , 2007.

_____
Notary Public  in  and  for  the  State  of

_____
My Commission Expires: _October 4, 2008_

UNIVERSITY of LOUISVILLE.

*Health Sciences Center*

---

**Edward C. Halperin, MD, MA, FACR**
**Dean of the School of Medicine**
**Ford Foundation Professor of Medical Education**
**Professor of Radiation Oncology, Pediatrics,**
   **and History**

University of Louisville
Abell Administration Center
323 East Chestnut Street
Louisville, Kentucky 40202-3866

Office: 502-852-1499
Fax:   502-852-1484
Web:  www.louisville.edu

July 12, 2007

Disability Services
National Board of Medical Examiners
3750 Market Street
Philadelphia, PA  19104-3190

Dear Sir/Madam:

Kirk D. Jenkins, one of our medical students, applied for and was denied testing
accommodations related to dyslexia for USMLE Step 1.  He is of appealing that decision.  I
would like to provide some background information on Mr. Jenkins and his experiences in the
first two years of medical school at the University of Louisville.

When Mr. Jenkins applied for admission to the class entering in 2005, he was very forthright in
providing documentation of his dyslexia and his life-long experience with it.  He was first
diagnosed as dyslexic in third grade, based on extensive testing.  He has since undergone a wide
range of testing several times and the results are all quite consistent.  As a result of this definitive
diagnosis, he has always been supplied with accommodations (normally time and a half and a
quiet environment to take the examinations).  He received these accommodations in grade
school, high school, college and for the MCAT.  His academic performance was good and we
admitted him two years ago.

With Mr. Jenkins long-term and thorough documentation of dyslexia, we have provided him
with testing accommodations throughout his first two years of medical school.  He has passed
all courses on the first attempt and is now ready to take USMLE Step 1 and then progress into
the third year of medical school.

I would ask the NBME to give full consideration to his appeal to be provided accommodations
for taking USMLE Step 1.

Sincerely yours,

Edward C. Halperin, M.D., M.A., F.A.C.R.
Dean, School of Medicine

ECH/ks

# UNIVERSITY of LOUISVILLE.

**UNIVERSITY ARCHIVES AND RECORDS CENTER**

University Libraries
University of Louisville
Louisville, Kentucky 40292

Office: 502-852-6674
Fax:   502-852-6673
http://library.louisville.edu/uarc/

November 8, 2007

Ms. Lesley Steen
Mullin Hoard & Brown, L.L.P.
500 South Taylor, Suite 800, LB# 213
Amarillo TX 79101

Dear Ms. Steen:

As official custodian of the records of the University of Louisville I am acknowledging receipt of your email with attached letter dated November 5, 2007. Addressed to Ms. Kathy Pendleton, it was forwarded to me for response. I respond on behalf of the university to all requests made of U of L employees under the Kentucky Open Records Act and the federal Family Educational Rights and Privacy Act (FERPA), as well as to subpoenas and other requests for the inspection of university records. This includes internal as well as external requests.

I directed an email reply your way, but it bounced back. Then I called you to ask you to send to me a signed release from Mr. Jenkins to the effect that the university has his permission to supply such approval/certification to you. I said I expected this would be only a formality, but I asked it pursuant to the university's guidelines under FERPA.

Having received from you Mr. Jenkins's release, and the memo with his ID number redacted as I'd requested, I am hereby certifying the authenticity of the memo re Kirk Jenkins dated August 24, 2005, from Kathy Pendleton to "Faculty/Instructor." The university has no objection to your use of it with Mr. Jenkins's approval.

Sincerely yours,

William J. Morison, Ph.D.
Open Records Officer
FERPA Compliance Officer &
Director, UARC

**EXHIBIT**

11

MEMO:      Faculty/Instructor

FROM:      Kathy Pendleton, Assistant Director

DATE:      August 24, 2005

RE:        KIRK JENKINS

ID:


The above named student is currently enrolled at the U of L Medical School. This student has been identified as having a disability and requires special accommodations throughout the semester. **It is essential that disability related information be kept confidential. At no time should the class be told that the student has a disability, except at the student's request. All information that a student gives to the faculty member is to be used only for arranging accommodations for the student and may not be disclosed.**

We anticipate the following needs for this student:

**EXTENDED TEST TIME- Time and a half on written Exams**
**REDUCED DISTRACTION DURING TESTING**

Please visit the Faculty Room if you have questions about accommodations or assisting the student. The site includes accommodation strategies, faculty resources and much more to assist in making classroom environments accessible for students with disabilities:
**http://www.louisville.edu/student/dev/drc/faculty.html**


If you have any questions or concerns, please call me at 852-6938 or by e-mail: kjpend01@louisville.edu. Thank you so much for your assistance. Without your help, we would be unable to coordinate these critical support services.

## BUSINESS RECORDS AFFIDAVIT

STATE OF *Kentucky* §
§
COUNTY OF *Jefferson* §

BEFORE ME, the undersigned authority, personally appeared

*John Lacy* who, being by me duly sworn, stated as follows:

My name is *John Lacy*, I am over twenty-one (21) years of age,

of sound mind, capable of making this affidavit, and have knowledge of the facts herein

stated.

I am the custodian of the records of John M. Lacy, Ph.D. Attached hereto are 11

pages of records from John M. Lacy, Ph.D., regarding Kirk D. Jenkins. These said 11 pages

of records are kept by the said custodian of records in the regular course of business, and it

was the regular course of business of John M. Lacy, Ph.D. for an employee or representative

of John M. Lacy, Ph.D. with knowledge of the act, event, condition, or opinion recorded to

make the memorandum or record or to transmit information thereof to be included in such

memorandum or record; and the memorandum or record was made at or near the time of the

act, event, condition, or opinion recorded or reasonably soon thereafter.

The records attached hereto are exact duplicates of the original records, and it is the

policy of John M. Lacy, Ph.D. not to permit the originals to leave this office.

_____
Affiant

**EXHIBIT**

12

SWORN TO and SUBSCRIBED BEFORE ME on this ___8___<sup>TH</sup> day of

___November___, 2007.

_Sandra M. Brown_

Notary Public in and for the State of
KENTUCKY    STATE AT LARGE
SANDRA M. BROWN
My Commission Expires: _11-28-2008_



# JOHN M. LACY, PH.D., HSPP
## Licensed Clinical Psychologist

**1700 UPS Drive, Suite 208**
**Louisville, KY 40223**

**Phone: (502) 412-9197**
**Fax: (502) 412-8701**

## PSYCHOEDUCATIONAL REPORT
### (Confidential)

**Name: Kirk Jenkins**
**Date of birth: 5/13/1982**
**Date of consultation: 1/15/2007**

**Age: 24 years, 7 months**
**School: Univ. of Louisville Medical School**
**Evaluator: John M. Lacy, PhD.**

### Reason For Referral

Twenty-four year old Kirk Jenkins sought this psychoeducational evaluation to provide the National Board of Medical Examiners with updated documentation of his functional impairment secondary to a learning disability. This report is offered in a format that lists the required characteristics of such documentation.

### 1. State a specific diagnosis of the disability.

These evaluation results indicate Mr. Jenkins meets DSM-IV criteria for the following diagnoses: Reading Disorder (315.00); Disorder of Written Expression (315.2); and Learning Disorder Not Otherwise Specified (i.e., low academic fluency) (315.90).

### 2. Be current.

This evaluation was conducted on 1/15/2007.

### 3. Describe the specific diagnostic criteria and name the diagnostic tests used. Provide a detailed interpretation of the test results.

As defined in the DSM-IV, the diagnostic criteria for both Reading Disorder and Disorder of Written Expression are that 1) standardized test measurements of achievement in the skill

**Name: Kirk Jenkins**                                        **Page: 2**

in question are significantly lower than expected given the individual's chronological age, measured intelligence, and age-appropriate education; 2) this lower achievement interferes with the individual's more general academic achievement *(including gateway test scores)*; and 3) the disorder in question is not largely due a sensory deficit.

In a background interview, Mr. Jenkins produced educational documents that indicate he was first evaluated and diagnosed with a learning disability in the third grade. A 2/7/91 Multidisciplinary Team Meeting form indicates that "regular education alone cannot adequately and appropriately meet his needs," and 20 - 40% of his instructional time was spent receiving Special Education services. As a high school senior (1999-2000), was given a psychoeducational evaluation that again confirmed the presence of significant learning differences. His most recent psychoeducational evaluation was conducted in 2003 while he was a student at the University of Wisconsin (Madison), and his test scores again identified significant discrepancies between his expected achievement level (i.e., his intelligence) and his actual achievement levels in reading and spelling.

In the background interview, Mr. Jenkins reported that he has received different types of educational accommodations over the years, including extra time on tests consistently since the third grade. He reported that he almost always needs and uses the extra time, especially if the test requires much reading. He also estimated that he has to spend 1 ½ hours studying for each hour that a medical school classmate spends to learn the same amount of material. While he said that the medical school curriculum has not been conceptually difficulty for him (a statement that is consistent with his past IQ scores), it has been very difficult for him to handle the volume of the material because he processes text slowly. In this interview, Mr. Jenkins did not identify any historical medical, developmental or emotional/psychological factors that might have a bearing on his academic achievement or the results of this evaluation.

In this office, Mr. Jenkins was given two standardized tests that assessed his broad cognitive abilities and academic achievement levels (including academic *fluency*). He was very attentive during this testing session, and he had a methodical response style that frequently favored accuracy over speed. This was most evident on reading tasks, as his response latencies on most of those items were much higher than the norm for his age and level of education. His test scores (listed at the end of this report) are considered valid indicators of his cognitive abilities and academic achievement levels.

On the WAIS-III, Mr. Jenkins obtained a Verbal IQ Score of 131, Performance IQ Score of 122 and Full Scale IQ Score of 130. These IQ Scores reflect very superior broad verbal reasoning abilities and superior broad visual-spatial analytical skills, and his Full Scale IQ

**Name: Kirk Jenkins**                                                                 **Page: 3**

Score places him at the 98th percentile of adults his age for his overall performance on this intelligence test. Mr. Jenkins also obtained the following WAIS-III Index Scores: Verbal Comprehension - 129; Perceptual Organization - 133; Working Memory - 106; and Processing Speed - 96. The Index Discrepancy Tables for this test indicate that both his Working Memory and Processing Speed Indices lie significantly below his Verbal Comprehension and Perceptual Organization Indices, and individuals with a learning disability are significantly more likely than those in the general population to have these discrepancy patterns. In fact, Mr. Jenkins' four lowest WAIS-III subtest Scaled Scores (i.e., 9, 10, 10 and 11 on a 19-point scale) are the four Scaled Scores that constitute the Working Memory and Processing Speed Indices. While this is a noteworthy aspect of his WAIS-III profile, his Full Scale IQ Score of 130 can be considered his *expected achievement level* for comparison to the Standard Scores he obtained on measures of his academic skills and fluency.

On the WJ-III, Mr. Jenkins demonstrated academic skills and fluency that range from slightly below average to moderately above average. He is strongest in his mathematical calculation skills (i.e., Standard Score of 125), while his reading comprehension, phonetic attack, writing fluency, written expression and reading decoding skills lie slightly to moderately below his expected achievement level. Using a difference of 30 Standard Score points to denote a significant discrepancy between Mr. Jenkins' expected achievement level and his measured achievement, his reading fluency, math fluency and spelling skills (represented by Standard Scores of 84, 90 and 90, respectively) lie significantly below his expected achievement level and constitute learning disabilities. In addition, his Academic Fluency Standard Score of 87, as a composite measure of his reading, math and writing fluencies, lies significantly below his expected achievement level.

**5. Describe in detail the individual's limitations due to the diagnosed disability; i.e., a demonstrated impact on functioning vis-a-vis the USMLE and explain the relationship of the test results to the identified limitations resulting from the disability.**

As a lengthy test with a strict time limit that is presented in text form, the USMLE places Mr. Jenkins at a disadvantage relative to his knowledge of the material in question as a result of his low academic fluency and his reading decoding and written language disabilities. He has ample documentation of the stable presence of these learning differences, and his current test scores vary little from his previous test scores that date back to the third grade. In addition, he has repeatedly qualified for educational modifications that have, up to the present, included extra time on tests. As a result of these modifications and his own efforts, he has been able to achieve academically at a level consistent with his measured cognitive abilities.

**Name: Kirk Jenkins**                                                                 **Page: 4**

**6.  Recommend specific accommodations and/or assistive devices, including a detailed explanation of why these accommodations or devices are needed and how they will reduce the impact of the identified functional limitations.**

In light of this documentation that indicates Mr. Jenkins has a learning disability that is expressed as a combination of reading, writing and fluency difficulties, it is recommended that he receive 50% additional time on the USMLE Step 1.  This additional time with reduce the impact of his disability by allowing him to demonstrate his problem-solving abilities and knowledge of the target material at a level that is relatively consistent with his combined cognitive abilities and study efforts.

**7.  Establish the professional credentials of the evaluator, including relevant licenses or certifications.**

Respectfully,

John M. Lacy, PhD, HSPP
Licensed Clinical Psychologist (KY 0738; IN 20040548A)
Evaluator

**Name: Kirk Jenkins**                                                    **Page: 5**

## TEST RESULTS

### Wechsler Adult Intelligence Scale – Third Edition (WAIS-III)

| IQ/Index | *Standard Score | Percentile |
|---|---|---|
| Verbal IQ | 131 | 98 |
| Performance IQ | 122 | 93 |
| Full Scale IQ | 130 | 98 |
| Verbal Comprehension Index | 129 | 97 |
| Perceptual Organization Index | 133 | 99 |
| Working Memory Index | 106 | 66 |
| Processing Speed Index | 96 | 39 |

*(Average = 100; Standard Deviation = 15)*

| Verbal Subtest | **Scaled Score |
|---|---|
| Vocabulary | 14 |
| Similarities | 18 |
| Arithmetic | 12 |
| Digit Span | 10 |
| Information | 13 |
| Comprehension | 19 |
| Letter-Number Sequencing | (11) |

| Performance Subtest | **Scaled Score |
|---|---|
| Picture Completion | 15 |
| Digit Symbol-Coding | 9 |
| Block Design | 15 |
| Matrix Reasoning | 15 |
| Picture Arrangement | 12 |
| Symbol Search | (10) |

*(Average = 10; Standard Deviation = 3)*

**Name: Kirk Jenkins**                                             **Page: 6**

## Woodcock-Johnson III Tests of Achievement(WJ-III)
### (Age Norms)

| Subtest/Cluster | *Standard Score | Percentile | **Discrepancy Score |
|---|---|---|---|
| Letter-Word Identification | 94 | 34 | -36 |
| Passage Comprehension | 116 | 86 | -14 |
| Reading Fluency | 84 | 14 | -46 |
| BROAD READING | 92 | 29 | -38 |
| | | | |
| Calculation | 125 | 96 | -5 |
| Applied Problems  (Not administered) | | | |
| Math Fluency | 90 | 26 | -40 |
| BROAD MATH    (Not available) | | | |
| | | | |
| Spelling | 90 | 25 | -40 |
| Writing Samples | 96 | 40 | -34 |
| Writing Fluency | 107 | 69 | -23 |
| BROAD WRITTEN LANGUAGE | 96 | 39 | -34 |
| | | | |
| ACADEMIC SKILLS | 101 | 51 | -29 |
| ACADEMIC FLUENCY | 87 | 20 | -43 |

*(Average = 100; Standard Deviation = 16)
**(Discrepancy Scores of -30 or lower are statistically significant)

# JOHN M. LACY, PH.D., HSPP
**Licensed Clinical Psychologist**

**1700 UPS Drive, Suite 208**          **Phone: (502) 412-9197**
**Louisville, KY 40223**                **Fax: (502) 412-8701**


TO:     Kirk Jenkins
        1135 So. 1st Street, Apt. 9
        Louisville, KY 40203

FROM:   John M. Lacy, Ph.D.
        1700 UPS Drive, Ste. 208
        Louisville, KY 40223

RE:     5/18/07 NBME response to your request for USMLE Step 1 accommodations


Mr. Jenkins,

I have reviewed Dr. Catherine Farmer's response that documents NBME's reasons for denying your request for extended time on the USMLE Step 1, and I want to share what I believe are valid responses to several of the points Dr. Farmer made in the course of reviewing your historical documents and psychoeducational reports. For the sake of stylistic consistency with the reports I discuss in this letter, I refer to you in the third person after this point. I also place in parentheses the location of each of Dr. Farmer's statements within her letter that I discuss.

(Page 1, paragraph 2): Dr. Farmer states that "Learning difficulties of sufficient severity to substantially compromise reading and learning are generally recognized as being developmental in nature. Consequently, it is expected that chronic and pervasive difficulties with reading or learning will emerge during childhood." Dr. Michael Gontarsz' 1991 psychoeducational report establishes that Mr. Jenkins' reading and spelling in the classroom were of sufficient concern to his teachers to prompt a referral for more formal testing by the time he was in the third grade. It is well established that only selected students in our educational system are referred for one-to-one psychoeducational testing, so it is more reasonable to assume that he was exhibiting reading and spelling difficulties in the classroom than to assume that he was not. Thus, Dr. Farmer's assertion that learning difficulties are "developmental in nature" is quite consistent with Mr. Jenkins' historical documents that date back to his third grade year. In addition, Dr. Gontarsz' reference to his "family history of learning problems" is consistent with current theories and research regarding learning



**Kirk Jenkins**                                                            **Page 2**

disorders.  If, as I contend, Mr. Jenkins' learning disorder is primarily one of low reading fluency, the untimed K-TEA academic achievement tests he was given by Dr. Gontarsz would be unlikely to reflect this problem, but his performances on a wide range of classroom tasks *would* be likely to alert his teachers to a reading problem that might not be accurately labeled upon referral or identified through one-on-one testing.   Although Dr. Farmer emphasizes Dr. Gontarsz' conclusion that "it is questioned if reading should be considered an EEN," it is noteworthy that less than one month later, and with Dr. Gontarsz' report in hand, Mr. Jenkins' case conference committee (which included Dr. Gontarsz) concluded that he did have a learning disability and placed him in LD Resource programming.  It is stated in his 2/07/91 Multidisciplinary Team Meeting document, *"Regular education rejected since Kirk's learning difficulties require more assistance than what regular education can provide. ...Given Kirk's learning delays, regular education alone cannot adequately and appropriately meet his needs."*   As a psychologist who has performed many psychoeducational evaluations and case conferences with several school corporations over a span of twenty years, I believe Dr. Farmer was not justified in emphasizing selected portions of a 1991 psychoeducational report and drawing a conclusion regarding Kirk's functioning levels and need for special education programming sixteen years after the fact that opposes the conclusion of a group of professionals who were specifically entrusted with that decision and in contact with him at the time.

(Page 1, paragraph 3): Dr. Farmer refers to Mr. Jenkins' CTBS Total Reading performance that was better than those of 89% of his grade peers.  Mr. Jenkins has reported that he did receive the accommodation of extra time on many of his tests through his elementary, middle and high school years, though he cannot recall whether he received that accommodation on this fifth grade test.  It is my impression that either of two conditions - 1) the CTBS being given under extended time conditions or 2) the CTBS not including a reading *fluency* measure - could account for Mr. Jenkins' above average score.  Either way, it is clear that his accommodation of extra time on many of his regular classroom tests, along with other accommodations he may have received secondary to his LD classification, make his class grades less dependable measures of how well he might have functioned in school without accommodations.

(Page 1, paragraph 4): Dr. Farmer states, "...your overall performances on a range of cognitive and academic achievement tasks across four evaluations from 1991 to 2007 are well within the range of average functioning and do not demonstrate cognitive or academic deficits that substantially impair your ability to read, write, or learn relative to the average person in the general population." In my opinion, the question is not one of whether Mr. Jenkins can utilize phonics to decode words and/or utilize concept imagery and working vocabulary to comprehend text, but whether there is an underlying neurological process that



**Kirk Jenkins**                                                              **Page 3**

slows down the speed at which he can engage in one or both of these processes. A reading fluency problem cannot be directly measured by educational, psychological or medical tests of cognitive functions other than reading fluency. All of the tests given to Mr. Jenkins over the years to 'quantify' his reading difficulties (difficulties that were observed and reported by those who taught him on a daily basis) assessed other reading skills that were not and are not below the norm, but are simply far below his broad cognitive abilities and expected achievement level. However, *when he was finally given a direct measure of his reading fluency in 2007, he obtained a Standard Score of 84 and age-based Percentile Rank of 14 on this subtest. This Standard Score is below the norm within the general population.* On (page 2, paragraph 3) of her letter, Dr. Farmer ignores Mr. Jenkins' Reading Fluency Standard Score and instead refers to his Standard Scores in two areas (Broad Reading and Broad Written Language) that are not germane to the issue of a reading fluency disorder. It appears to this evaluator that Dr. Farmer selectively focused on statements and scores in several of Mr. Jenkins' historical documents that could be used to deny his request for extra time on the USMLE Step 1, while she made little or no mention of the data and conclusions that support his request.

(Page 2, first full paragraph): Dr. Farmer states that "currently validated theories and research do not support using a discrepancy model as *the sole basis* of a diagnosis or rationale for accommodations." As noted earlier in this response letter, Mr. Jenkins was initially referred for testing in the third grade because his teachers *observed* his struggles in the classroom, and the Multidisciplinary Team determined that he should be placed in LD Resource programming because of both his test scores and his teachers' observations. Thus, this group of educators acted in a manner *consistent* with Dr. Farmer's assertion that more factors than just discrepancy scores should form the basis for diagnosis and accommodations. In addition, Dr. David Holmes states in his 8/25/03 psychoeducational report that Mr. Jenkins' "...reading seems impacted when timed," and he did not link this problem to any of the Standard Scores obtained in his evaluation.

(Page 2, paragraph 2): Dr. Farmer states that "Using an extreme 98[th] percentile IQ as the standard by which all other scores should be measured incorrectly presumes that all abilities should be evenly developed." I am aware that individuals are expected to have profiles in any broad area of functioning that contain relative strengths and weaknesses, but I am also aware that one of the central purposes of measures of central tendency (such as means and standard deviations) is to identify intra-individual discrepancies that should be considered significant. I submit that the difference between an IQ (Standard) Score at the 98th percentile and a Reading Fluency Standard Score at the 14th percentile is, in combination with a history of reading slowly and needing extra time on reading-based tests, both significant and sufficient for determining that a reading fluency disorder exists.



(Page 2, paragraph 3): Dr. Farmer states that "... the ADA covers individuals who are substantially limited in a major life activity." As a medical school student, Mr. Jenkins' most frequent and important daily pursuits (i.e., major life activity) involve meeting all of the educational requirements necessary to remain in medical school. If passing a specific test is required in order to continue as a student, then it doesn't matter if that test isn't a daily activity. It is clearly viewed as a *representation or measurement* of Mr. Jenkins' daily activities as a student. However, such a test is only representative in its content, and I suspect there is no research support for considering the time in which a student finishes the USMLE Step 1 to be a valid measure of his or her mastery of the material. If he is handicapped because his reading fluency lies significantly below all other reasonable measures of your knowledge and abilities as a medical student, *as well as below the norm within the general population*, then during a timed reading-based test he is handicapped and substantially limited in his pursuit of what is for him a major life activity.

(Page 2, paragraph 3): Dr. Farmer states, "Determination of whether an individual is substantially limited in functioning as compared to most people is based on assessment of the current impact of the identified impairment." It has been established that Mr. Jenkins does have a reading fluency disorder that handicaps his ability to read text as quickly as the norm within the general population, so the questions are 1) whether this disorder will cause him to fail the USMLE Step 1, and if so, 2) what will the impact of his failing this test be? It is doubtful that NBME has norms that show what impact a reading rate at the 14th percentile within the general population has on an individual's chance of passing this test, as it is doubtful that many individuals with this low level of fluency ever take this test. It is a statistical fact that most individuals who read at this rate also decode words, comprehend text and reason in general at or near this below average level. And yet, Mr. Jenkins is an individual who was diagnosed with both a learning disability and superior intelligence in childhood through the most widely accepted evaluation methods and who (with testing accommodations as needed) has passed the required tests thus far to gain admittance to medical school and progress to his third year in this demanding field of study. Dr. Farmer refers in her letter to "working harder than others" and "performing below one's expectations on standardized examinations in a competitive environment" as possible issues that Mr. Jenkins and all of his past evaluators might be confusing with a learning disorder. In this respect, she, and by extension, NBME contend that this evaluator, Dr. Gontarsz, Dr. Haynes, the Rothschild School Multidisciplinary Team, and all University of Louisville Medical School personnel who have chosen to grant Mr. Jenkins extra time on tests are misinterpreting the nature and severity of his condition.

**Kirk Jenkins**                                                    **Page 5**

I remain available to assist in your appeal of NBME's decision in any professional capacity that I can.

Respectfully,

John M. Lacy, Ph.D. HSPP